MARY L. CRIST, DEFENDANT IN ERROR, v. MASSACHUSETTS BONDING AND INSURANCE COMPANY, PLAINTIFF IN ERROR.*

Kansas City Court of Appeals.   March 1, 1926.

*Corpus Juris-Cyc References: Accident Insurance, 1CJ, p. 504, n. 48; Appeal and Error, 4CJ, p. 853, n. 59.

*George F. Longan* and *Mark A. McGruder* for defendant in error.

*Harding, Murphy & Tucker* for plaintiff in error.

ARNOLD, J.—This is an action to recover on a policy of accident insurance issued by defendant to one Leo J. Crist, of date May 15, 1923, the term thereof beginning at 12 o'clock noon on said date, continuing for the months of June, July, August, September, October and November, 1923, and insuring said Crist against the effects resulting directly and exclusive of all other causes from bodily injuries sustained during the life of the policy solely through external violent and accidental means (excluding suicide, sane or insane), and against disability resulting from illness which is contracted and begins during the life of the policy and after it has been maintained in continuous force for fifteen days from its date, in the principal sum of $2000, if the death of the insured resulted directly and exclusive of all other causes from the bodily injury sustained and within 120 days from the date of the accident.

The petition which is formal alleges the facts relative to the issuance of the policy; that plaintiff herein is the mother of the insured and was named as beneficiary in the policy in case of death by accident

as provided in the policy; that defendant is a corporation authorized to do business in the State of Missouri. Plaintiff states that the insured died on August 11, 1923, in or near the City of Tulsa, Okla., while said policy was in full force and effect; that he came to his death directly and exclusive of all other causes by being fired upon and shot in and about the head and body with a shot gun, then and there held by one Tood Harlow, from which wounds so received, said insured died instantly.

The petition further alleges that the required notice of the death of the insured was given defendant and that upon receipt of such notice defendant furnished plaintiff with blanks for proofs of death, and that proofs of death were furnished as required by the terms of the policy; that plaintiff demanded payment of $2000, the amount of the policy, but payment has not been made. Plaintiff states that more than sixty days have expired since proofs of death were filed in accordance with the terms of the policy herein sued on, and asks judgment for the amount of the policy and costs of suit.

The answer is, first, a general denial, and as affirmative defense it is alleged that the death of the insured was a direct result of his willful and intentional act.

The cause was instituted in the circuit court of Pettis county and was there tried to a jury. Verdict and judgment were for plaintiff in the sum of $2000 and defendant appealed to this court. On motion of plaintiff the appeal was dismissed for failure to comply with our rules, and the case is now here on a writ of error.

It was stipulated by the parties hereto that defendant might introduce in evidence in this case all the testimony taken at the murder trial at Pawhuska, Osage county, Oklahoma, in case No. 1233, entitled State of Oklahoma v. C. C. Harlow, it being provided that *all* of such testimony be introduced, and not merely parts or extracts therefrom. This stipulation provided that:

"It is understood and agreed that under the laws of the State of Missouri such testimony above referred to would not be admissible in the form referred to, but plaintiff agrees to and hereby waives any and all legal objections to the admissibility of said testimony."

It was further stated that it was the purpose and intent of the parties that when such testimony was so produced and introduced it should have the same force and effect as though taken originally in the form of depositions in the case at bar, or as though the witnesses appeared in person at the trial of this cause. In addition to some parol evidence, the testimony taken at the said murder trial in Oklahoma was introduced as per stipulation.

The testimony shows that the insured, Leo J. Crist, was a young man twenty-four years of age, married and had one child; that he and his family lived with his mother, the plaintiff herein, on a small farm two or three miles west of the City of Sedalia, Mo., and that he

462

was employed in some shops in Sedalia. He was rather small of stature and weighed 135 to 150 pounds. With his wife and child Crist went from Sedalia, Mo., to Tulsa, Okla., where he arrived on August 4, 1923, the purpose of the journey being that Mrs. Crist, during her approaching confinement, might be with her mother, Mrs. Zack Burton who lived at Tulsa. Crist had bought the automobile in Sedalia and was obligated to pay for it in installments, one payment being about due. C. C. (Tood) Harlow, who also had married a daughter of the Burtons, had promised to furnish Crist money to meet the payment so that Crist might remain with his wife during her confinement. Harlow, who was a wealthy Osage Indian, resided a few miles from Tulsa at a point between Tulsa and the home of young Burton, a brother of the wives of Harlow and Crist.

On August 11, 1923 Crist, with his wife and mother-in-law, left Tulsa in an automobile to visit Mrs. Crist's brother above mentioned, and on the way they stopped at the home of Harlow for a call and incidentally to see about getting the money for payment on the car. On arriving at the Harlow home, they parked their car on the east side and at the front of the house and repaired to the house or to the lawn in front thereof.

The testimony shows that after they had left their car and come into the yard and on to the porch, Harlow came around the side of the house and sat down with them, and they all engaged in friendly conversation for a few moments; that Crist then left the party and went through the house, presumably to get a drink of water; and that Harlow soon followed him through the house. Within three or four minutes a shot was fired and Harlow came running back through the house.

The evidence shows that at the west side, or rear, of the house there was a screened-in porch and west of that and adjoining was a four-foot platform with steps leading from it to the ground. The porch had a door opening onto the platform and swinging to the north and which was located in about the center of the platform. Adjoining the porch was a room of the house which extended to the south.

On the firing of the shot the persons who had been in the front of the house hurried to the rear and found Crist's dead body lying on his back with his feet under the running board of a Ford automobile which was standing slightly northeast and southwest within a foot or a foot and a half of the steps leading to the platform, with his head between the front of the car and the steps. Crist had been shot in the head and death was instantaneous.

Witnesses described the situation as follows: The body of Crist was found with his head close to the step, his feet under the running board and almost against the right rear wheel of the car, the head lying northeastward and the feet southwestward, the position of the

room adjoining the screened porch on the east of the body and the automobile as above stated. There is some dispute as to the proximity of the body to the steps and the automobile. On this point the testimony of Mrs. Crist, widow of the insured, is as follows:

"Well, he was lying on his back with his head against the platform steps and you couldn't get between his head and steps, and his legs were up under the Ford car almost to his knees.

"Q. What kind of Ford car, was it a touring car? A. A roadster with a commercial bed on the back of it.

"Q. How far were your husband's feet from the back wheel? A. Well, wasn't very far.

"Q. Close? A. Yes, sir.

"Q. But they were under it? A. His legs were up under the fender.

"Q. Back or front? A. Towards the back wheel."

As to the location of the car from the steps this witness testified that it was about a foot, or less, and that a person could not easily go between the car and the steps. One witness for Harlow, one Thurman, stated the automobile stood some six feet or more from the steps, but in this statement he was not corroborated by any other witness.

There is testimony that a small pocket knife was found near the body of Crist. The knife is described as having two blades, the larger of which was about two inches in length and closed and the smaller one which was open had the point broken off, leaving the blade not quite half an inch in length. In further elucidation it was shown that Harlow was a young man, about six feet in height and weighed from 200 to 300 pounds, so that by comparison he was much larger than Crist.

Mrs. Burton, mother-in-law of Harlow and Crist, testified she was at the scene of the shooting immediately after the shot was fired; that she saw Crist's body lying on the ground and corroborated the testimony of Mrs. Crist, the widow, as to its location and position. This witness further testified that she examined the Ford car beneath the running board of which the body was lying, and that she saw blood and brains on the car "extending from the part where the seat is, back;" that she saw no blood on the hood of the car; it was nearer the back—the body of the car, it had a bed that extended back behind. She stated she saw no blood in the back of the bed but did see it on the side, next to the house on the body of the car, blood and brains, too.

The record shows there was but one eye-witness to the shooting, to-wit, Bill Thurman, who was in the employ of Harlow, who was not overly bright and was under age. This witness stated he was in the house and that Crist came *around* the house to the back thereof, and that he, himself, went through the house to the back and joined Crist at the rear; that they sat on the running board of the car and

talked a few minutes and that Crist asked him to call Harlow out of the house; that he went and called Harlow but Harlow was busy and could not come then; that Crist told him three times to call Harlow and to tell him if he didn't come he (Crist) would come in and drag him out; that each call was more insistent than its predecessor and each time accompanied by epithets and threats; that in a few minutes Harlow came out of the house; that while witness was talking to Crist, Crist had a knife in his hand whittling on a clothespin; that when Harlow came out, Crist said to him "Well, what about it?" Witness did not hear Harlow's reply; that Crist threw the clothespin in the back of the bed of the automobile and "took a smash at him, a smash or so." That Harlow started toward the house and said "don't follow me in here," and then came upon the steps; that Crist "started coming up there, slow about it, but he started coming up the steps," and then followed Harlow toward the house; that Harlow got a shot gun and said to Crist, "Don't come any further!" and that Crist said "I'm not afraid of the God damn gun." That Crist then took another step and Harlow shot him; that when Harlow shot, Crist had a knife in his upraised hand and the blade, which was not very long, was open. The witness stated that at the time Harlow was standing inside the screen door, gun in hand, and propping the screen door open with his foot, and that when the shot was fired Crist was about to get upon the steps; that Crist fell between the steps and the Ford car, a few feet from the car. In describing the way in which Crist fell, this witness stated that "he just kind of fell backwards . . . just kind of weaved."

There was testimony to the effect that Crist's knife was found, after the shooting, on the running board of the Ford car. Thurman testified that when Harlow first came out of the house, Harlow and Crist started to go toward the west and then came back; that the witness was sleepy and started to go to bed in the small room adjoining the screened-in porch; that he lay down on the bed and glanced out and saw Harlow and Crist coming back; that he had been on the bed four or five minutes when he saw Harlow with the gun; that the gun was kept behind the door of the room where he was on the bed; that he did not see Harlow get the gun and did not see him in the room.

This witness was contradicted by the State's witnesses in many essential details, notably in the location of the Ford car; the relative position of the body of Crist as regards the car and its proximity to the steps of the platform; also, there was a contradiction between the testimony of this witness and that of all the others relative to whether Crist went through, or around, the house in reaching the rear thereof. The relevancy of all this testimony to the facts in the case at bar will appear hereafter.

It is defendant's theory that Leo J. Crist, the insured, was the aggressor in the encounter which resulted in his death and therefore that his death was not caused by accidental means but was such a result as any reasonable person might have foreseen. Appellant urges that error was committed by the court in refusing to sustain the demurrer offered at the close of plaintiff's case and again at the close of all the evidence; that under the terms of the policy, the burden of proof was upon plaintiff to show that the death of the insured was due to bodily injuries received solely through accidental, violent and external means. [Atherton v. Ry. Mail Assn., 221 S. W. 752; Kopriviac v. Ins. Co., 218 S. W. 689; Brunswick v. Ins. Co., 278 Mo. 154, 213 S. W. 45; Dunn v. Ins. Co., 197 Mo. App. 457, 196 S. W. 100.]

This brings us to the question of whether the proof that Harlow was the aggressor in the encounter was of sufficient substance to take the case to the jury. If this question is answered in the affirmative, the court did not err in refusing defendant's peremptory instructions, for it is the rule, which will not be disputed, that where there is present such substantial proof, this court will not disturb the finding of the jury. [Black v. Emory, 275 S. W. 51, and cases therein cited.] There was testimony introduced at the murder trial in Oklahoma to the effect that Crist had made threats against the life of Harlow, but we think that evidence is not material here. We have to consider the circumstances immediately surrounding the killing as decisive of the point here in dispute. Bill Thurman's testimony at the murder trial, if believed by the jury, would seem to support defendant's theory that Crist was the aggressor and that Harlow killed him in self defense, and Thurman being the only eye-witness, his testimony could not be directly refuted.

But in some very essential details this witness was flatly contradicted by witnesses for the State, e. g. as to the distance of the Ford car from the porch and the position of the body of Crist in relation to the car. Thurman stated that Crist was shot while advancing toward Harlow, and yet, he said that Crist fell upon his back with his head toward Harlow—a situation not possible if Thurman's testimony were true. There are other points of significant import which, if believed by the jury, would tend to disprove the truth of Thurman's testimony. For instance, that the blood and brains of the dead man were found on the side of the automobile, near where Crist had been sitting on the running board of the car. From this evidence, the jury might reasonably infer that Crist was not on his feet and advancing toward Harlow when shot, for if he had been his head would have been in a line above the body of the car. Also there was testimony on the part of the State that Crist's knife was found, after his death, on the running board of the car and that the body was found with the feet well under the running board, in front of and near the

466

right rear wheel. This situation, the jury were justified in believing, was not possible if the encounter took place as Thurman testified.

We think the evidence, as a whole, supports the reasonable inference that Harlow was the aggressor in the affray and that it sustains the verdict of the jury. This being true, under the law, we are not authorized to disturb that finding. The judgment is affirmed. *Bland, J.,* concurs; *Trimble, P. J.,* absent.